STATE EX REL. STRYKOWSKI, and others, Petitioners, v. WILKIE, Administrative Director of Courts, and others, Respondents.

*No. 76–596–OA.  Argued September 1, 1977.—*
*Decided January 3, 1978.*
(Also reported in 261 N.W.2d 434.)

492

496

For the petitioners there were briefs by *Curtis M. Kirkhuff, Daniel A. Rottier,* and *Oldenburg, Lent & Kirkhuff, S. C.,* and oral argument by *Curtis M. Kirkhuff,* all of Madison.

For respondent, Edwin M. Wilkie, the cause was argued by *John E. Armstrong,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

For respondents, St. Clare Hospital and St. Mary's Hospital, there was a brief by *Axley, Brynelson, Herrick & Gehl,* and oral argument by *Eugene Gehl* all of Madison.

Amicus curiae briefs were filed by: *John C. Carlson, Richard L. Cates* and *Lawton & Cates* of Madison, for the Board of Governors of the Insurance Fund; by *State Bar of Wisconsin* for The Medical Malpractice Committee, State Bar of Wisconsin; by *John A. Kluwin, Eric J. Van Vugt* and *Kluwin, Dunphy, Hankin & McNulty* of Milwaukee, for the State Medical Society of Wisconsin; by *John H. Lederer* and *DeWitt, McAndrews & Porter, S. C.* of Madison, for the Wisconsin Hospital Association.

CONNOR T. HANSEN, J. The petitioners, all alleged to have sustained damages as a result of medical malpractice, petitioned this court for a writ of certiorari. We granted leave to commence an original action.

The petitioners seek a declaration that Chapter 655, Stats., violates constitutional guarantees of equal protec-

tion and due process, constitutes an unlawful delegation of judicial authority, and impairs the right of trial by jury. They also seek review of the actions of the Administrative Director of Courts (hereinafter Administrator) in convening six-member panels to hear their malpractice claims under Chapter 655.

The parties stipulated to the facts. St. Clare Hospital and St. Mary's Hospital, respondents in two of the malpractice claims, were added as party respondents on stipulation.

Briefs amicus curiae have been filed by the Board of Governors of the Insurance Fund, State Medical Society of Wisconsin, Medical Malpractice Committee of the State Bar of Wisconsin, Wisconsin Hospital Association, and Wisconsin Academy of Trial Lawyers. Each has been considered.

Chapter 655, Stats., enacted by ch. 37, Laws of 1975, effective July 24, 1975, established an exclusive procedure for the prosecution of malpractice claims against a "[h]ealth care provider," as defined by sec. 655.001 (8).

Under Chapter 655, Stats., no court action may be maintained for injuries arising from medical malpractice until the matter has been reviewed by a patients' compensation panel. These panels are convened by the Administrator. Proceedings before a panel are initiated by filing a "submission of controversy" which briefly states the claim. Sec. 655.04.

Claims under $10,000 are heard by a three-member informal panel unless the parties stipulate to a hearing before a formal panel; claims over $10,000 are heard by an informal panel unless one party requests a formal panel in writing. A formal panel is defined as "a 5-member patients compensation panel established under s. 655.03 (1)." Sec. 655.001 (6), Stats. The composition of these formal panels is governed by sec. 655.03 (1), the meaning of which is at issue.

Once convened, a panel determines the issues of negligence, causation and damages, applying comparative negligence principles. Sec. 655.065(1), (2), Stats. These determinations are made by a majority vote. Sec. 655.16 (2).

A court action may be commenced within 120 days after the panel's decision. The findings of a formal panel with regard to causation and negligence are admissible at trial; the damage award may be admitted in the judge's discretion. Sec. 655.19(1), Stats. No panel member may appear at the trial as counsel or as a witness. Sec. 655.19. If no action is commenced within 120 days, judgment may be rendered in accordance with the panel's order. Sec. 655.20.

The Patients Compensation Fund, created by sec. 655.-27, Stats., pays that portion of medical malpractice awards above certain limits. Sec. 655.27(1). It is financed by assessments against health care providers. The fund is managed by a board of governors and "held in trust for the benefit of insureds and other proper claimants." Sec. 655.27(7). Malpractice claimants seeking damages in excess of $200,000 must name the fund as a defendant, and the fund may appear and defend against the action. Sec. 655.27(5).

Chapter 655, Stats., also imposes certain limitations upon the payment of malpractice awards. Awards for future medical payments in excess of $25,000 are paid to a medical expenses fund and are disbursed as future medical expenses are incurred. These payments continue until the amount is exhausted or the patient dies. Sec. 655.015. Claims in excess of $1,000,000 are paid in annual installments of not more than $500,000. Sec. 655.27 (5) (d). After July 1, 1979, awards will be automatically limited to $500,000 per incident if the fund falls below certain levels. Sec. 655.27(6).

In addition, Chapter 655, Stats., requires health care providers to maintain insurance with specified minimum

liability limits. Chapter 619, also enacted by ch. 37, Laws of 1975, provides for the establishment of mandatory risk-sharing plans.[1] These mandatory insurance and risk-sharing provisions are not in dispute.

The instant case concerns three petitions on unrelated causes of action arising from three separate incidents of alleged medical malpractice. In each case a submission of controversy was filed, pursuant to sec. 655.04, Stats., requesting a hearing before a formal panel, as authorized by sec. 655.04(2)(b). The three cases are consolidated in this proceeding.

Each claim involved both physician and nonphysician respondents and therefore resulted in a need for the construction of the ambiguous language of sec. 655.03 (1), Stats., which governs panel composition when correspondents represent different health care professions. In each case the Administrator convened a six-member panel. Petitioners' motions to limit the panels to five members were denied. Petitioners challenge the establishment of six-member panels on both statutory and constitutional grounds.

The claim of petitioner Strykowski further involves a possible cause of action against the designer or manufacturer of a vacuum extractor employed in the delivery of the Strykowskis' infant son, who died shortly after birth. The designer and manufacturer are not subject to the Chapter 655 panel review process, however, and were not named as respondents in the Strykowski submission of controversy. Counsel for the Strykowskis argues that their inability to join these possible tort-feasors in the panel's proceedings denies them due process of law. Additional facts will appear in the discussion of the issues.

Initially we observe that the Administrator contends that the petitioners' constitutional argument should not

---

[1] These provisions have been modified by ch. 131, Laws of 1977, effective November 1, 1977.

be considered because of the rule that one who voluntarily seeks the benefits of a statute may not later attempt to escape the results of its application by challenging its constitutionality. *State v. Keehn,* 74 Wis.2d 218, 222, 246 N.W.2d 547 (1976). The Administrator also contends that the petitioners lack standing to challenge the fact that the statutes treat claims over $10,000 somewhat differently than claims for less than that amount.

While it can appropriately be argued that these two contentions are meritorious, we believe the issues advanced are of considerable public importance and significance. The issues presented are *publici juris* because they are vital to the functioning of the health care liability and patients' compensation plan prescribed by the enactment of Chapter 655, Stats.[2]

We therefore consider the merits of the following issues:

1. Does sec. 655.03 (1), Stats., permit the appointment of six-member patients' compensation panels?

2. Does Chapter 655, Stats., violate the principle of equal protection of the laws?

3. Does Chapter 655, Stats., deny medical malpractice victims due process of law?

4. Does the creation of mandatory patients' compensation panels constitute an unlawful delegation of judicial authority?

5. Does Chapter 655, Stats., impair malpractice claimants' right of trial by jury?

## PANEL COMPOSITION.

Formal panels ordinarily consist of five members, only two of whom represent medical professions. Whenever a submission of controversy names both a physician and a nonphysician respondent, however, the Administrator

---

[2] *Mueller v. Jensen,* 63 Wis.2d 362, 367, 217 N.W.2d 277 (1974); *State v. Seymour,* 24 Wis.2d 258, 128 N.W.2d 680 (1964).

considers sec. 655.03(1), Stats., to require the appointment of a sixth member.

Accordingly, he convened six-member panels to hear each of the claims involved in this action. Each panel consisted of an attorney, two public members, a tenured physician, a physician from the same field of medicine as a physician respondent and a member from the same health care field as a nonphysician respondent. Petitioners argue that the Administrator has misinterpreted the statute, and that the panels should be limited to five members.

Sec. 655.001(6), Stats., defines a "[f]ormal panel" as a "5-member patients compensation panel established under s. 655.03(1)." Subsections (a), (d) and (e) of sec. 655.03(1) provide that formal panels shall include a physician appointed for a six month term, an attorney and two lay members. These provisions are unambiguous and are not in question. Subsections (b) and (c) of sec. 655.03(1) govern the selection of the remainder of the panel. They provide:

"(b) If any respondent in a panel hearing is a physician, one additional physician licensed to practice medicine in this state and who is engaged in the practice of medicine similar to that of the respondent and appointed at random by the administrator from a list submitted by the medical examining board.

"(c) If any respondent in a panel hearing is not a physician, then one person from the same field of health care as that of the respondent who is licensed in this state and appointed at random by the administrator from a list supplied by the appropriate state licensing board or by the department of health and social services. *In the event that a claim involves more than one respondent, and that the respondents are specialists in different areas of medical practice, the administrator shall determine the specialty to be represented on the panel."* (Emphasis supplied.)

The meaning of the emphasized language is in dispute. When a claim is asserted against both a physician and

a nonphysician, as in the instant action, is the Administrator empowered to choose *between* a physician member under subsection (b) and a nonphysician member under subsection (c)? Or is he required to appoint *both* a physician member under subsection (b) and a sixth, nonphysician, member under subsection (c), with his discretion limited to the selection of the field to be represented by each of these members?

The Administrator has adopted the latter interpretation. This court has sometimes deferred to the practical construction accorded an ambiguous statute by the administering agency, where the legislature has acquiesced in that construction. The argument has much less weight when the construction is of recent origin, however. *General D. & H. Union v. Wisconsin E. R. Board*, 21 Wis.2d 242, 248, 249, 124 N.W.2d 123 (1963). The construction in question was first applied on April 11, 1976.

Nor can it be said that the legislature has acquiesced in the administrative construction of the statute. This is particularly apparent in the instant case because since this case was argued the legislature has enacted ch. 131, Laws of 1977, published October 31, 1977. Sections 10 and 14 of this enactment, effective November 1, 1977, amend secs. 655.03(1)(b) and 655.03(2)(a)(3), (b) and (c), Stats. Any ambiguity as to the legislative intent in the original enactment has now vanished. The 1977 amendments make it clear that the legislature intended that the formal panels consist of five members and the informal panels of three members.

We are satisfied the legislature intended to require the appointment of five-member formal panels. This construction of the statutes is supported by materials in the Wisconsin Legislative Reference Bureau, which materials are properly subject to judicial notice. *Nekoosa-*

*Edwards P. Co. v. Public Serv. Comm.*, 8 Wis.2d 582, 590, 591, 99 N.W.2d 821 (1959).

These materials show that the disputed language of sec. 655.003(1)(c), Stats., is derived from an amendment drafted on June 27, 1975. The drafting attorney's notes include the following instructions: "Multiple suits—only 1 additional M D—sec'y of reg & lic. chooses specialty."[3] (As enacted, the Bill placed this power in the Administrator rather than the Secretary of Regulation and Licensing.)

The Bill drafting file also includes the drafting attorney's notes of the deliberations of the conference committee which prepared the final version of the Bill. These notes show the following:

*"Panel composition*
"...
"Formal— . . . 5 people on these panels
"Formal—ct. admin. appoints 4 panels & chooses specialty if more than 1 rep."[4]

In enacting the statute, the legislature had before it the advice of the legislative reference bureau that:

". . . These panels each have 5 members; a physician, an attorney (who is chairperson), a health care provider of the same type or specialty as the respondent (who serves for one case only), and 2 public members. . . ."[5]

The statutory language was capable of more than one reasonable interpretation. However, the legislative back-

---

[3] 1975 LRB–5835–1, Amendment 6 to Amendment 6 to Senate Substitute 1 to Assembly Bill 725, in drafting file for Laws of 1975, ch. 37.

[4] Legislative attorney's notes of July 7, 1975, meeting of Conference Committee, p. 4, in bill file for Laws of 1975, ch. 37.

[5] 1975 LRB–5938/2, *Analysis by the Legislative Reference Bureau*, p. 2, in bill file on Laws of 1975, ch. 37.

ground materials, together with the prompt action of the 1977 legislature to clarify any existing ambiguity, lead us to conclude that the legislature intended to limit the formal panels to five members. The Administrator erred in appointing six-member panels.

### EQUAL PROTECTION.

One who challenges a statute's constitutionality carries a heavy burden of persuasion. He must overcome the presumption of constitutionality described in *State ex rel. Hammermill Paper Co. v. La Plante,* 58 Wis.2d 32, 46, 205 N.W.2d 784 (1973):

". . . It is not enough that respondent establish doubt as to the act's constitutionality nor is it sufficient that respondent establish the unconstitutionality of the act as a probability. Unconstitutionality of the act must be demonstrated beyond a reasonable doubt. Every presumption must be indulged to sustain the law if at all possible and, wherever doubt exists as to a legislative enactment's constitutionality, it must be resolved in favor of constitutionality. This court has often affirmed the well-established presumption of constitutionality that attaches itself to all legislative acts. . . ."

The court cannot reweigh the facts as found by the legislature. If the court can conceive any facts on which the legislation could reasonably be based, it must hold the legislation constitutional. *State ex rel. Carnation M. P. Co. v. Emery,* 178 Wis. 147, 160, 189 N.W. 564 (1922).

At the outset, it is necessary to consider petitioners' argument that Chapter 655 is subject to strict judicial scrutiny and, therefore, must be overturned unless supported by a compelling state interest. The "strict scrutiny" standard applies only to classifications involving a "suspect" category or a fundamental right. *Town of Vanden Broek v. Reitz,* 53 Wis.2d 87, 93, 191 N.W.2d

913 (1971), *appeal dismissed* 406 U.S. 902, 92 Sup. Ct. 1608, 31 L. Ed. 2d 813; *Modern v. McGinnis,* 70 Wis.2d 1056, 1072, 236 N.W.2d 240 (1975). Chapter 655 involves neither.

Petitioners urge that the statutory classifications are based on "economic conditions" which should be considered suspect. This apparently refers to the fact that the statute (1) affects only those tort claims involving medical malpractice and (2) distinguishes claims over $10,000 from smaller claims. Such distinctions have not been recognized as suspect criteria. Unlike the criteria traditionally considered suspect, these classifications do not involve immutable personal characteristics or historical patterns of discrimination and political powerlessness. *See: San Antonio School District v. Rodriguez,* 411 U.S. 1, 93 Sup. Ct. 1278, 36 L. Ed.2d 16 (1973), *rehearing denied,* 411 U.S. 959, 93 Sup. Ct. 1919, 36 L. Ed.2d 418.

Petitioners' reliance on *Shapiro v. Thompson,* 394 U.S. 618, 89 Sup. Ct. 1322, 22 L. Ed.2d 600 (1969), is misplaced. This court has had occasion to consider that case and has found it to be based not on economic criteria, but on the right to travel. *Town of Vanden Broek v. Reitz, supra,* 93. Nor does the statute deny fundamental rights. The right of access to the courts, where petitioners will have an opportunity for jury trials, is expressly preserved. Sec. 655.19, Stats. The equal protection clause therefore requires only that there be a rational basis for the statute.

Petitioners' equal protection argument has two parts. First, they challenge the fact that the act applies only to victims of medical malpractice and not to all tort victims. Second, they attack a series of "subclassifications" within the statutory scheme. There is no rational basis for treating medical malpractice claims differently from

other tort claims, they argue, because there was no "malpractice crisis."[6] This court is not concerned with the wisdom or correctness of the legislative determination, however; its task is to determine only whether there was a reasonable basis upon which the leglisature might have acted. *Coffee-Rich, Inc. v. Department of Agriculture,* 70 Wis.2d 265, 269, 234 N.W.2d 270 (1975).

We believe there is a rational basis upon which the legislature could and did act when enacting Chapter 655.

Some of its reasons are suggested by the findings set forth in sec. 1, ch. 37, Laws of 1975. These findings, while not binding upon the court, carry great weight. *West Allis v. Milwaukee County,* 39 Wis.2d 356, 159 N.W.2d 36 (1968), *certiorari denied* 393 U.S. 1064. The legislature cited a sudden increase in the number of malpractice suits, in the size of awards, and in malpractice insurance premiums, and identified several impending dangers: increased health care costs, the prescription of elaborate "defensive" medical procedures, the unavailability of certain hazardous services and the possibility that physicians would curtail their practices. In addition, resolution of a malpractice claim under the traditional tort litigation process has been found to require an average of nineteen months.[7] A patients compensation panel, on the other hand, must render a decision within 150 days after the submission of controversy is filed. Sec. 655.04 (4) (a), Stats.

---

[6] At least one court has reached the same conclusion, while others have disagreed. *Compare: Graley v. Satayatham,* Ohio Com. Pl., 74 Ohio Op.2d 316, 343 N.E.2d 832 (1976), with *Simon v. St. Elizabeth Medical Center,* Ohio Com. Pl., 3 Ohio Op.3d 164, 355 N.E.2d 903 (1976).

[7] Stephen K. Dietz, C. Bruce Baird, Lawrence Berul, *THE MEDICAL MALPRACTICE LEGAL SYSTEM,* Appendix, Report of The Secretary's Commission On Medical Malpractice, Dept. of Health, Education, and Welfare, Washington, D. C., 1973, p 87, 103.

The statute satisfies the five criteria of reasonableness set forth in many of this court's decisions.[8] Medical malpractice actions are substantially distinct from other tort actions. The classification is plainly germane to the act's purposes. The law applies to all victims of health care providers as described therein. The legislature declares that the circumstances surrounding medical malpractice litigation and insurance required the enactment of the legislation.

In 1911, this court upheld the Workmen's Compensation Act against an equal protection challenge. *Borgnis v. Falk Co.*, 147 Wis. 327, 133 N.W. 209 (1911). Workmen's compensation (now worker's compensation) hearings under that Act, although elective, represented a greater departure from common law tort actions than do the panels involved here.

Like the Workmen's Compensation Act, Chapter 655, Stats., was enacted in response to a perceived economic and social crisis. Like the Workmen's Compensation Act, it applies only to a limited class of injured persons. Both laws modify the common law procedures for redress of personal injuries. The public has an important interest in the quality of health care, and the legislature's

---

[8] (1) All classifications must be based upon substantial distinctions which make one class really different from another.

(2) The classification adopted must be germane to the purpose of the law.

(3) The classification must not be based upon existing circumstances only and must not be so constituted as to preclude addition to the numbers included within a class.

(4) To whatever class a law may apply, it must apply equally to each member thereof.

(5) The characteristics of each class should be so far different from those of other classes as to reasonably suggest at least the propriety, having regard to the public good, of substantially different legislation. *See: e.g., Dane County v. McManus* (1972), 55 Wis.2d 413, 423, 198 N.W.2d 667.

efforts to promote that interest cannot be said to be unreasonable.

The petitioners' equal protection argument also concerns the creation of "subclassifications" within the statutory scheme. Review of "subclassifications" is governed by the same principles applicable to all legislative classifications. *State ex rel. La Follette v. Reuter,* 36 Wis.2d 96, 109, 153 N.W.2d 49 (1967).

Petitioners challenge a series of subclassifications. First they attack the fact that formal panels are available on the request of a single party if the claim exceeds $10,000, but only on the stipulation of all parties if the claim is less than $10,000. Sec. 655.04(2), Stats. The legislature may reasonably believe that large claims are more likely to involve complex or numerous proofs which would make formal panel proceedings a more appropriate forum. The legislature has established other simplified procedures for small controversies. See Chapter 299 (small claims court); and Chapter 867 (summary settlement of small estates).

Second, petitioners attack the delayed disbursement of future medical expense awards of more than $25,000. Sec. 655.015, Stats. That portion of the award for future medical expenses in excess of $25,000 is to be paid to the future medical expenses fund[9] and to be disbursed in periodic payments for these expenses until the amount is exhausted or the patient dies. This procedure was obviously intended for the benefit of the claimant with substantial injuries requiring long-term treatment. It cannot be said that the legislation is unreasonable or denies equal protection of the law.

---

[9] Sec. 655.015, Stats., formerly provided for payment of such awards to the commissioner of insurance. Ch. 29, Laws of 1977, sec. 1579, effective June 30, 1977, amended this section to provide for payment into a "future medical expenses fund."

Third, petitioners attack the requirement that the Patients Compensation Fund be named a defendant whenever a claim exceeds $200,000, Sec. 655.27 (5) (a), Stats., and that awards in excess of $1,000,000 be paid in annual installments of $500,000 or less. Sec. 655.27 (5) (d). These provisions protect the integrity of the fund which is established for the benefit of the claimants. Delayed payment of very large awards is not inimical to the interest of the claimant, and protects the fund from the effect of catastrophic awards or judgments which would otherwise threaten the solvency of the fund. These provisions are reasonable.

Fourth, petitioners challenge the $500,000 recovery limit applicable to acts of malpractice occurring after July 1, 1979. Sec. 655.27 (6), Stats. This ceiling takes effect only if the fund falls below certain levels, and does not apply to medical expenses. There is no conceivable way in which this statutory provision can effect the instant petitioners. We deem it judicially inappropriate to now express judgment on the prospective application of this statute.

Petitioners' fifth challenge concerns the victims of acts of alleged medical malpractice involving several health care providers. As the statute was applied to the instant petitioners, they were required to present their claims to six-member panels, while victims of a single tort-feasor present their claims to five-member panels. Since we have held that the Administrator erred in appointing six-member panels, and the legislature has adopted remedial legislation to clarify any existing ambiguity, we are not called upon to further discuss this proposition.

Petitioners' final equal protection argument concerns the exclusion of governmental employees and facilities

from the law's coverage, Sec. 655.001(8), Stats. A statute does not violate the equal protection clause merely because it is not all-embracing. The state may direct its laws against the problems it perceives without covering the whole field of possible abuses. *Madison Metropolitan Sewerage Dist. v. Committee,* 260 Wis. 229, 255, 256, 50 N.W.2d 424 (1951). The statute is not invalid on equal protection grounds because it might have gone further than it did.

Our conclusion is that the enactment does not violate the equal protection rights of the petitioners.

## *DUE PROCESS.*

Petitioners assert that there is a fundamental right of free access to the courts. They identify five aspects of the panel review process which they say impair this right, denying them the due process of law guaranteed by the fourteenth amendment of the United States Constitution and art. I, sec. 1 of the Wisconsin Constitution.

The Administrator contends that there is no right of access to the courts, except in the narrow category of cases involving such fundamental human relationships as marriage and divorce. *Boddie v. Connecticut,* 401 U.S. 371, 91 Sup. Ct. 780, 28 L. Ed.2d 113 (1971); *United States v. Kras,* 409 U.S. 434, 93 Sup. Ct. 631, 34 L. Ed.2d 626 (1973).

Whatever the precise status of the right of access to the courts, it is clear that due process is satisfied if the statutory procedures provide an opportunity to be heard in court at a meaningful time and in a meaningful manner. *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 Sup. Ct. 893, 47 L. Ed.2d 18 (1976). Due process is flexible and requires only such procedural protections as the particular situation demands. *Id.*

Petitioners find an impermissible burden in the financial expense of trying a case to a panel prior to a jury trial. It has been held, however, that a party is not deprived of due process merely because it must seek administrative resolution of its claims before it has access to the courts. *West Penn Power Company v. Train* (3rd Cir. 1975), 522 Fed.2d 302, 313. This conclusion is equally applicable to the panel review process.

States are under no constitutional obligation to neutralize the economic disparities which inevitably make resort to the courts different for some plaintiffs than others. Unlike *Boddie v. Connecticut, supra,* this case does not involve a "fundamental human relationship," nor is it alleged that petitioners are denied access to the courts because of indigency. Petitioners offer no authority for their economic hardship argument, and we do not find it persuasive.

Next, petitioners attack the pleading process set up by sec. 655.12, Stats. Under this section, respondents are not required to file an answer in response to a submission of controversy. Petitioners argue that this denies them the opportunity to know and meet the arguments of the opposing parties, contrary to fundamental concepts of notice and fair play.

The fourteenth amendment does not give litigants a property right in any particular form of pleading or procedure. *See: State v. Coubal,* 248 Wis. 247, 255, 21 N.W. 2d 381 (1945). This court recently held that the defendants in two mortgage foreclosure actions were not denied due process by the failure of another defendant to serve them with its answer alleging claims against the mortgaged property. This court held that due process requirements were met because the defendants had received adequate notice of the claims in the complaints,

with which they had been served. *Lipeles v. Flood,* 69 Wis.2d 413, 417, 230 N.W.2d 722 (1975). Similarly, a medical malpractice claimant has available notice of the respondents' defenses through the discovery process. Because an answer is unlikely to provide detailed or useful information,[10] any prejudicial effect is minimal if not nonexistent.

The petitioners next claim that because two of the five-panel members are health care providers, Chapter 655, Stats., denies them a right to an impartial decision maker. This argument appears to be based upon the presumption that all health care providers are prejudiced. We know of no rule of law or constitutional interpretation to support such a proposition.

As a general rule, it can be stated that the due process requirement of a fair hearing requires that those who have a substantial pecuniary interest in a proceeding should not adjudicate a dispute. *Gibson v. Berryhill,* 411 U.S. 564, 579, 93 Sup. Ct. 1689, 36 L. Ed.2d 488 (1973); Ward v. Village of Monroeville, 409 U.S. 57, 60, 93 Sup. Ct. 80, 34 L. Ed.2d 267 (1972). *Ward* was a case involving a mayor who also sat as a judge in certain minor offenses. The mayor was responsible for the village finances, and a substantial portion of the village finances were derived from the fines imposed in the court over which he presided. In *Gibson, supra,* the Alabama Board of Optometry was composed entirely of private practitioners. The Board had begun efforts to revoke the licenses of all Alabama optometrists employed by corporations—nearly one-half of all optometrists in the

[10] The optional form answer prepared by the office of the Administrator merely identifies the parties, states the nature of the claimant's condition and injury, indicates whether the injury is less than or more than $10,000, and either admits or denies that the claimant (1) was a client, (2) was treated, (3) suffered from an act of malpractice, and (4) is entitled to damages.

state. In both *Ward* and *Gibson* it was understandably held that the defendants were denied due process. The same result was reached in *Tumey v. Ohio,* 273 U.S. 510, 47 Sup. Ct. 437, 71 L. Ed. 749 (1927), a case in which the presiding judge received the fees and costs only if the defendant was convicted.

We do not believe that the foregoing cases lead to the conclusion that panels, as constituted by Chapter 655, Stats., deny petitioners an impartial tribunal or that they violate due process.

In *Kachian v. Optometry Examining Board,* 44 Wis.2d 1, 170 N.W.2d 743 (1969), this court rejected an argument that there was an inescapable and unconstitutional financial interest involved when an optometrist sat in judgment of other optometrists as a member of the state board of examiners in optometry. The court said:

". . . It cannot be held as a matter of law that a member of a certain profession or occupation is disqualified by that fact from serving on an administrative board dealing with such profession or occupation." *Kachian v. Optometry Examining Board, supra,* at 12.

This court has said that to disqualify an adjudicator, a pecuniary interest must be:

". . . a direct, certain and immediate interest, and not one which is indirect, contingent, incidental or remote." *Goodman v. Wisconsin Electric Power Co.,* 248 Wis. 52, 58, 20 N.W.2d 553 (1945), *quoting* 30 Am. Jur., *Judges,* p. 773, sec. 57.

The petitioners argue that panel members who are health care providers are financially interested in panel decisions because they, along with all other health care providers in the state, pay annual assessments to maintain the patients' compensation fund. However, any financial interest inherent in the structure of Chapter 655,

Stats., is too remote and speculative to require disqualification.[1] Absent evidence to the contrary, adjudicators must be presumed to be persons of honesty and integrity. *See: Withrow v. Larkin,* 421 U.S. 35, 47, 95 Sup. Ct. 1456, 43 L. Ed.2d 712 (1975).

Petitioners' claim is not one of actual bias. There is no suggestion that any panel member bears them ill will or has a financial stake in their particular claims. It may be assumed that if such actual bias were alleged and demonstrated, panel members would be subject to the common-law duty of disqualification. *See: Kachian v. Optometry Examining Board, supra,* at 12, 13. Because there is no indication of actual bias, and because the statutory procedure for the selection of the panel does not suggest a probability of systematic bias or prejudice, the requirements of due process are satisfied. *Cf. Naus v. Jt. S. D. No. 1 Sheboygan Falls,* 76 Wis.2d 104, 114, 250 N.W.2d 725 (1977).

There is an additional consideration. Screening panels are required to consider and decide highly technical medical issues. Without the special expertise of medically-trained panel members, the central purposes of the entire statutory scheme would be frustrated. In holding that professionals could serve on administrative boards dealing with their own professions, this court, in *Kachian, supra,* at 12, asked " 'What are the alternatives?' . . . Would it be preferable, or even workable, to have the dentists giving bar examinations and optometrists giving pharmacy tests?" The same concern is relevant here.

[1] In the year preceding February 28, 1977, the fund levied assessments against 5,389 physicians, 147 hospitals and 319 nurse anesthetists. *Functional and Progress Report,* Wisconsin Patients Compensation Fund, February 28, 1977, pp. 11–12. As a public record, this report is subject to judicial notice. *Cf. Dehnart v. Waukesha Brewing Co.,* 21 Wis.2d 583, 596, 124 N.W.2d 664 (1963).

Disqualification of medical members would emasculate the panel review process.

Therefore, considering the size of the panel, its composition, the method of selection of panel members, the relative shortness of a single member's service on the panel, the monetary size of the fund and the substantial number of contributors, we cannot hold that the composition of the panel constitutes a denial of due process under either the state or federal constitutions.

An additional objection, only indirectly grounded on the due process clause, concerns the ability of the Patients Compensation Fund to defend against claims in excess of $200,000. *See:* sec. 655.27(5), Stats. Petitioners argue that this provision makes the interest of the fund adverse to those of the medical malpractice claimant and therefore in violation of the trustee's duty to hold the res "in trust for the benefit of insureds and other proper claimants." Sec. 655.27(7).

Section 178 of the Restatement (2d) of *Trusts,* (1959), p. 385, states:

"The trustee is under a duty to the beneficiary to defend actions which may result in a loss to the trust estate, unless under all the circumstances it is reasonable not to make such defense."

At the same time, sec. 183, p. 393, of the Restatement (2d), *supra,* says:

"When there are two or more beneficiaries of a trust, the trustee is under a duty to deal impartially with them."

The question here is whether, by defending against certain large actions, the fund is fulfilling the first duty or violating the second.

The Board of Governors of the insurance fund in its brief amicus curiae argues that the fund may defend

against what it believes to be groundless or exaggerated claims. The petitioners, on the other hand, rely on *In re Cudahy Family Trust,* 26 Wis.2d 153, 131 N.W.2d 882 (1965), in which this court held that a trustee must not assume the advocacy of one of several rival claimants to a private trust. The fund is held for the benefit of both the insured health care providers and malpractice victims. Petitioners imply that by resisting claims, the fund would be favoring insured health care providers at the expense of victims, or would be favoring some victims over others.

The rule relied upon by petitioners is ordinarily applied when the trustee stands as a stakeholder for rival claimants to the same trust benefits; the resolution of such disputes has no adverse effect on the trust assets and is properly a matter of indifference to the trustee. This rule does not apply where the trustee reasonably determines that the claim is adverse to the trust. Thus, this court was careful to point out that *Cudahy, supra,* did not involve "a claim . . . so obviously without merit that it is in effect an adverse claim." *Cudahy, supra,* 157.

The Supreme Court of Colorado has held that the trustee of a public pension fund has a duty to resist the claims of unqualified pension applicants. That court said:

". . . It is within the power, and is the duty of a trustee to institute action and proceedings for the protection of the trust estate, . . . and to take all legal steps . . . reasonably necessary with relation to those objectives. . . ." *Brisnehan v. Central Bank and Trust Company,* 134 Colo. 47, 51, 52, 299 Pac.2d 113 (1956).

We believe this proposition is sound.

On its face, therefore, the fund's right to defend against certain actions does not violate its trust responsibilities.

Petitioners' fifth due process argument is that malpractice victims should be able to present all their causes of action—including those based on a products liability theory—in a single proceeding. The Strykowskis allege a cause of action against the manufacturer of a vacuum extractor used in the delivery of their child in addition to a cause of action against the health care providers. We see no denial of due process in the procedural requirement that the alleged medical malpractice claimant proceed against health care providers before a panel prior to commencing a consolidated action against all potential tort-feasors. All parties could be joined in a court action once the panel had made its decision, which would be no more than 150 days from the time a submission of controversy was filed. Sec. 655.04(4).

This procedure is less harsh than comparable proceedings under worker's compensation. A single work-related injury may involve products liability, employer liability under worker's compensation and third party liability in negligence. The percentage of negligence attributable to each party may be sharply contested. Nevertheless, the employee's exclusive remedy against the employer is in worker's compensation. The employer cannot be interpleaded as a defendant in the employee's negligence action against the third parties. *Albert v. Regal Ware,* 6 Wis.2d 519, 95 N.W.2d 240 (1959).

Chapter 655, Stats., proceedings, which delay the opportunity for a consolidated action, are no more objectionable than these well-established worker's compensation procedures, under which the employee's cause of action is permanently fragmented.

Petitioners touch upon, but do not develop, the further due process argument that a common-law right of recovery may not be limited without providing a *quid pro quo* to the party who is thereby disadvantaged. Relying

on dictum in *New York Central Railroad Co. v. White*, 243 U.S. 188, 37 Sup. Ct. 247, 61 L. Ed. 667 (1916), courts in some states have fashioned a *quid pro quo* test for legislation which alters common-law rights.[12] We are aware of no decision of this court adopting this test,[13] nor is it required by decisions of the United States Supreme Court. It is therefore not controlling, and we do not now adopt it.

## DELEGATION OF JUDICIAL AUTHORITY.

The petitioners contend that Chapter 655, Stats., contravenes art. VII, sec. 2 of the Wisconsin Constitution, which vests the judicial power of the state in the courts. They argue that because the panels determine causation, negligence and damages, and because they are required to apply the comparative negligence statute, sec. 895.-045, and are generally "bound by the law applicable to civil actions" in the administrative proceeding before them, sec. 655.17(1), they are usurping judicial authority.[14] Perhaps this would be so if the rights of the petitioners terminated with the determination of the panel. However, there is no usurpation of judicial au-

[12] *See: Jones v. State Board of Medicine*, 97 Idaho 859, 555 Pac.2d 399, 408, 409 (1976) (rejecting the *quid pro quo* test), and Comment, *A Constitutional Perspective on the Indiana Medical Malpractice Act*, 51 Ind. Law Journal, 143, 149–152 (1975).

[13] *See: Hunker v. Royal Indemnity Co.*, 57 Wis.2d 588, 608, 609, 204 N.W.2d 897 (1973), which recognizes the existence of the doctrine in other jurisdictions.

[14] *See: Wright v. Central Du Page Hosp. Ass'n.*, 63 Ill.2d 313, 347 N.E.2d 736 (1976), which held that the medical review panels created by the Illinois statute unconstitutionally exercised judicial power. Under the Illinois statute a member of the judiciary was required to participate in the administrative determination of negligence and damages by the panel, and the vote of the member of the judiciary could be overridden by the lay members of the panel.

thority here because not only are the petitioners afforded a judicial review of the determination of the panel, they are entitled to a trial de novo in a court. This court has often held that *quasi*-judicial authority may constitutionally be delegated to commissions and administrative agencies. *Dunphy Boat Corp. v. Wisconsin E. R. Board,* 267 Wis. 316, 64 N.W.2d 866 (1954); *Forest County v. Langlade County,* 76 Wis. 605, 45 N.W. 598 (1890).

Under the worker's compensation statutes, the Industry, Labor & Human Relations Commission, through its hearing examiners, decides controversies concerning work related injuries and diseases. The commission's orders are subject to only limited judicial review. Sec. 102.23, Stats. Nevertheless, the system does not invade the province of the courts. In upholding the constitutionality of the Workmen's Compensation Act, this court said:

". . . We do not consider the Industrial Commission a court, nor do we construe the act as vesting in the Commission judicial powers within the meaning of the constitution. It *is an administrative body or arm of the government which in the course of its administration of a law is empowered to ascertain some questions of fact and apply the existing law thereto, and in so doing acts quasi-judicially, but it is not thereby vested with judicial power in the constitutional sense.*

"There are many such administrative bodies or commissions, and with the increasing complexity of modern government they seem likely to increase rather than diminish. Examples may be easily thought of,—town boards, boards of health, boards of review, boards of equalization, railroad rate commissions, and public utility commissions all come within this class. They perform very important duties in our scheme of government, but they are not legislatures or courts. . . . While acting within the scope of its duty, or its jurisdiction, as it is sometimes called, such a board may lawfully be endowed with very broad powers, and its conclusions may be given great dignity and force, so that courts may not reverse them unless the proof be clear and satisfactory that they

are wrong . . ." (Emphasis added.) *Borgnis v. Falk Co., supra,* 358, 359.

Similarly, patients compensation panels are empowered to ascertain facts and apply the existing law thereto. Petitioners would distinguish *Borgnis v. Falk Co., supra,* on the ground that worker's compensation proceedings do not involve determinations of negligence, nor do they ascertain damages, which are fixed by statutory schedules. This argument ignores the fact that a panel's findings, unlike compensation awards, are subject to a trial de novo. The findings are entitled to no particular weight, and the reviewing court has full opportunity to test the panel's conclusions.

Administrative boards and commissions are plainly able to exercise *quasi*-judicial authority. In fact, this court has held that:

". . . [S]ome duties involving inquiries *judicial* in their nature may be delegated to administrative officers where the acts of such officers are later subject to judicial review." *Family Finance Corp. v. Sniadach,* 37 Wis. 2d 163, 176, 154 N.W.2d 259 (1967), *reversed on other grounds,* 395 U.S. 337, 89 Sup. Ct. 1820, 23 L. Ed.2d 349 (1969) (Emphasis added.)

For these reasons, we do not believe that the enactment of Chapter 655, Stats., constitutes an unconstitutional exercise of judicial power.

## TRIAL BY JURY.

Art. I, sec. 5, of the Wisconsin Constitution provides, in part:

"The right of trial by jury shall remain inviolate, and shall extend to all cases at law without regard to the amount in controversy; . . ."

Petitioners contend that the panel review process is incompatible with this guarantee in two respects. First,

they argue that the expense inherent in panel proceedings limits the accessibility of a subsequent trial. Second, they argue that the admissibility of panel findings undercuts their right to have a jury determine the facts.

The petitioners argue that the need to produce expert testimony makes medical malpractice actions unusually costly even in the absence of the screening panel, and that the procedures created by Chapter 655, Stats., unfairly force a claimant to put in his proof twice—once before the panel and a second time at trial. We view this as a strong argument in favor of the legislative enactment of procedures such as those here involved. They encourage settlements, "weed out" frivolous claims and provide a means whereby those justly entitled to compensation can secure early disposition of their claims.

Our attention has been directed to *La Bowe v. Balthazor,* 180 Wis. 419, 193 N.W. 244 (1923), and *State v. Graf,* 72 Wis.2d 179, 240 N.W.2d 387 (1976). While these cases underline the importance of the right to a trial by jury, they do not suggest that the particular forms of procedure familiar to common law must be preserved inviolate. The legislature may modify old procedures, or create new ones, if the substantive right to jury trial is preserved. Thus in *State ex rel. Sowle v. Brittich,* 7 Wis.2d 353, 96 N.W.2d 337 (1959), this court upheld a statute which modified the standard for waiver of jury trial in paternity cases. The court said at 360:

"While the defendant has a right to a trial by jury, he has no vested right under the Wisconsin constitution to the manner or time in which that right may be exercised or waived. Those are procedural matters expressly left for determination by law . . ."

Nor does the constitution protect a plaintiff against the costs implicit in bringing his action before a jury.

In *State v. Graf, supra,* 185, the court quoted with approval from *Adams v. Corriston,* 7 Minn. 456 (1862):

" 'The Constitution does not guarantee to the citizen the right to litigate without expense, but simply protects him from imposition of such terms as unreasonably and injuriously interfere with his right to a remedy in the law, or impede the due administration of justice.' "

Whether Chapter 655 imposes unreasonable or injurious costs should be determined in light of its purposes. In *La Bowe v. Balthazor, supra,* 423, the court found that "it was quite clearly the intention of the legislature to impose the high jury fee in order to discourage trials by jury." In contrast, there is no indication that Chapter 655 is intended to discourage trials. Indeed, by identifying and focusing complex issues, the panels aid jury determination of those cases which do go to trial.

The introduction of proceedings preliminary to trial is not in itself objectionable. Proceedings before an administrative agency may involve varying degrees of expense and delay. Even where those costs are substantial, however, would-be litigants are generally required, under the exhaustion-of-remedies requirement, to avail themselves of the administrative proceedings before coming to court. In some instances, including worker's compensation proceedings, their opportunity for jury trial is completely foreclosed. The panel review procedure imposes no greater burden than these administrative proceedings and is therefore constitutionally valid.

Petitioners next argue that the admissibility of panel findings is likely to have an undue influence on the jury. They rely on *Simon v. St. Elizabeth Medical Center, supra,* 908, in which an Ohio trial court found that the admissibility of the decision of medical malpractice arbitrators:

". . . effectively and substantially reduces a party's ability to prove his case, because that party must persuade a jury that the decision of the arbitrators was incorrect, a task not easily accomplished in view of the added weight which juries have traditionally accorded the testimony of experts . . ."

The procedure under review in *Simon*, however, permitted the arbitrators to testify at trial, a practice which would be likely to increase the influence on a jury and which is forbidden under Chapter 655, Stat. Sec. 655.19. Furthermore, the court in *Simon* indicated that the right to trial by jury precludes expert testimony on the ultimate fact in issue in malpractice cases, a conclusion which is contrary to the established rule in this state. *Rabata v. Dohner*, 45 Wis.2d 111, 172 N.W.2d 409 (1969) ; sec. 907.04, Stats.

The Illinois Supreme Court has also held that the Illinois malpractice statute denied the right of jury trial. The court's discussion of this issue was purely conclusory, however,[15] and offers no guidance for this court. Other courts have reached an opposite conclusion, and have rejected the notion that jurors will be improperly influenced by panel findings. *Eastin v. Broomfield*, 116 Ariz. 576, 570 Pac.2d 744 (1977) ; *Prendergast v. Nelson*, 199 Neb. 97, 256 N.W.2d 657 (1977) ; *Halpern v. Gozan*, 85 Misc.2d 753, 381 N.Y.S.2d 744 (Sup. Ct. 1976) ; *Comiskey v. Arlen*, 55 App. Div.2d 304, 390 N.Y.S.2d 122 (Sup. Ct. 1976). Each of the foregoing cases concerned a distinctive statutory procedure, none of which were identical to the procedure now before this court.

Sec. 655.19, Stats., provides in part that:

---

[15] "Because we have held that these statutes providing for medical review panels are unconstitutional, it follows that the procedure prescribed therein as the prerequisite to jury trial is an impermissible restriction on the right of trial by jury . . . ." *Wright v. Central Du Page Hosp. Ass'n., supra*, at 324.

"(1) . . . The findings and order, except for damages awarded, of any formal panel shall be admissible in any action in circuit or county court, and the amount of damages awarded may, at the court's discretion, be admissible in such action . . . ."

Petitioners argue that the jury will be unable to evaluate the panel's findings and order with objectivity, and that the right of trial by jury will therefore be infringed upon. We disagree. The medical review panel does not decide the case; the ultimate arbiter of all questions of fact is the jury.

Given a choice of reasonable interpretations of a statute, this court must select the construction which results in constitutionality. *State ex rel. Lynch v. Conta,* 71 Wis.2d 662, 689, 239 N.W.2d 313 (1976); *Feest v. Allis-Chalmers Corp.,* 68 Wis.2d 760, 767, 229 N.W.2d 651 (1975). This court has construed deficient statutes to include constitutionally required provisions. *State ex rel. Farrell v. Stovall,* 59 Wis.2d 148, 207 N.W.2d 809 (1973); *State ex rel. Matalik v. Schubert,* 57 Wis.2d 315, 204 N.W.2d 13 (1973); *Huebner v. State,* 33 Wis.2d 505, 147 N.W.2d 646 (1967). In *State ex rel. Chobot v. Circuit Court,* 61 Wis.2d 354, 212 N.W.2d 690 (1973), we interpreted sec. 944.21(1)(a), Stats., by changing this court's previously mandated definition of obscenity to comport with the constitutional definition of obscenity as set forth in *Miller v. California,* 413 U.S. 15, 93 Sup. Ct. 2607, 37 L. Ed.2d 419 (1973). There we said:

". . . [T]his court has the duty to uphold the statute if it can and in the past has supplied deficiencies to save a statute . . ." *Chobot, supra,* at 367. We conclude that the statutes under review, as we construe them, do not interfere with the constitutional right of trial by jury.

Panel findings, orders, and awards may be based upon a majority vote of the panel. Sec. 655.05, Stats. Chapter

655 does not indicate whether any minority or dissenting report of panel members is also admissible in evidence. We conclude that both the majority report and any concurring or dissenting report shall be admissible as part of the panel's findings and order.

■

Chapter 655 does not expressly provide that the parties may comment upon the panel's findings and order, nor does it provide that evidence may be introduced to rebut, explain, or support the panel's findings and order. However, few statutes can be written to completely cover all areas of concern. We do not consider Chapter 655 to preclude either party, in the course of opening or closing arguments, from commenting upon the panel's report in the same manner as comments may be made on other evidence, or from commenting upon the composition of the panel or the nature of panel proceedings. Nor does the act preclude either party from impeaching the panel's report by competent evidence. The parties remain free to call, examine, and cross-examine witnesses as if the report had not been made at all; and to show that material evidence was not presented to the panel; or demonstrate that the panel proceedings were less detailed or comprehensive than the jury trial itself. The panel's findings and order are simply evidence to be weighed by the jury and accepted or rejected, as with any other evidence.

The panel, by majority vote, is to make findings ". . . upon the ultimate facts involved in the case," and to file an order which ". . . shall state its determination as to the rights of the parties and include any award to be made." Sec. 655.16, Stats. In its findings, the panel is to determine ". . . [w]hether the actions or omissions of the health care provider were negligent and ". . . [i]f such actions or omissions were negligent, whether the negligence caused injury or death to the patient." Sec. 655.065.

The panel's findings and order are admitted into evidence to aid the jury in its deliberations. We therefore consider secs. 655.065 and 655.16 to require the panel to make findings upon the ultimate facts with regard to each allegation of malpractice (*i.e.,* to determine whether the respondent was or was not casually negligent), and to make findings of the primary or evidentiary facts from which, by a process of reasoning and inference, the ultimate facts are determined. These findings should help to focus and clarify the issues, which are often highly technical, for the benefit of the jury. The panel's findings will thus be in the nature of findings of fact. They shall not contain the panel's conclusions of law.

We believe the statutory admissibility of panel findings and orders is, in essence, a rule of evidence. *Comiskey v. Arlen, supra,* at 309; *See: Meeker & Co. v. Lehigh Valley R. R.,* 236 U.S. 412, 430, 35 Sup. Ct. 328, 59 L. Ed. 644 (1915) ; *Mills v. Lehigh Valley R. R.,* 238 U.S. 473, 482, 35 Sup. Ct. 888, 59 L. Ed. 1414 (1915). Similar statutory provisions in other states have been characterized as evidentiary rules allowing a specialized form of expert opinion. *Eastin v. Broomfield, supra,* at 570 Pac.2d 749; *Prendergast v. Nelson, supra,* at 256 N.W. 2d 665, 666, *Comiskey v. Arlen, supra,* at 309. Thus viewed, the admissibility of the panel's findings is constitutionally unobjectionable because litigants have no vested rights in particular rules of evidence. *State ex rel. Sowle v. Brittich, supra,* at 360.

The proper application of this rule, as with any rule of evidence, is the responsibility of the trial court. No boiler plate jury instruction can be drafted to cover all factual situations. However, the trial court shall instruct the jury with clarity and simplicity to the end that the

jurors are impressed with the fact that the panel's findings and order are in no way binding upon the jury, but are to be accorded such weight, and such weight only, as the jury may choose to give them. The trial court shall further instruct the jury to the effect that the jury remains the final arbiter of the issues raised and the facts presented and that its determination, based upon its consideration of *all* the evidence, will prevail.[16]

We are of the opinion that, with the safeguards we have outlined, Chapter 655 provides adequate opportunity to challenge the findings and order of the panel, and that there will be no constitutional infirmity to contaminate the exclusive prerogatives of the jury. We are confident that, with proper instructions from the trial court, a jury will be able to evaluate the panel's findings and order with independence and objectivity.

We believe the requirement of panel review prior to trial is comparable to the compulsory reference of a case to a special master. In *Ex parte Peterson,* 253 U.S. 300, 40 Sup. Ct. 543, 64 L. Ed. 919 (1920), a federal district court case had been referred to an auditor for factual determinations and for an expression of the auditor's opinion on the disputed issues. The auditor's report, if accepted by the trial court, was to be admitted at the trial. The issue before the Supreme Court was whether this procedure impaired the right of trial by jury in federal court, under the seventh amendment of the United States Constitution.

Writing for the court, Justice BRANDEIS said:

". . . The command of the Seventh Amendment that 'the right of trial by jury shall be preserved' does not require that old forms of practice and procedure be re-

---

[16] We do not intend to prescribe the precise form or contents of such an instruction. We suggest that the subject may be appropriate for consideration by the Civil Jury Instructions Committee of the Wisconsin Board of Circuit Court Judges.

tained. *Walker v. New Mexico & Southern Pacific R. R. Co.*, 165 U.S. 593, 596. Compare *Twining v. New Jersey*, 211 U.S. 78, 101. It does not prohibit the introduction of new methods for determining what facts are actually in issue, nor does it prohibit the introduction of new rules of evidence. Changes in these may be made. New devices may be used to adapt the ancient institution to present needs and to make of it an efficient instrument in the administration of justice. Indeed, such changes are essential to the preservation of the right. The limitation imposed by the Amendment is merely that enjoyment of the right of trial by jury be not obstructed, and that the ultimate determination of issues of fact by the jury be not interfered with.

"*. . . .*

"*Nor can the order be held unconstitutional as unduly interfering with the jury's determination of issues of fact, because it directs the auditor to form and express an opinion upon facts and items in dispute.* The report will, unless rejected by the court, be admitted at the jury trial as evidence of facts and findings embodied therein; . . . *The parties will remain as free to call, examine, and cross-examine witnesses as if the report had not been made.* No incident of the jury trial is modified or taken away either by the preliminary, tentative hearing before the auditor or by the use to which his report may be put. . . ." (Emphasis added.) *Ex parte Peterson, supra,* at 309–311.

The auditor's report in *Ex parte Peterson, supra,* was subject to the approval or rejection of the trial court, while a medical review panel's findings and order are necessarily admissible under sec. 655.19, Stats., if restricted in contents to those matters encompassed within the statute as we have construed it. However, in *Meeker & Co. v. Lehigh Valley R. R., supra,* the Supreme Court considered a statutory provision closely analogous to the statutes in question here. *Meeker* was a civil action brought under the Act to Regulate Commerce for the purpose of recovering damages sustained as a result of allegedly unreasonable and discriminatory freight rates.

The action followed a proceeding before the Interstate Commerce Commission in which the Commission had found that the rates in question were unreasonable and discriminatory and had made an order awarding damages to the plaintiff. Under section sixteen of the Act to Regulate Commerce, the Commission's findings and order were to be admitted as *"prima facie* evidence of the facts therein stated"* in any suit for enforcement of the Commission's order. The defendant railroad argued that this provision infringed the right of trial by jury. The Supreme Court rejected this argument and said:

"This provision only establishes a rebuttable presumption. It cuts off no defense, interposes no obstacle to a full contestation of all the issues, and takes no question of fact from either court or jury. At most therefore it is merely a rule of evidence. It does not abridge the right of trial by jury or take away any of its incidents. Nor does it in any wise work a denial of due process of law. . . ." *Meeker & Co. v. Lehigh Valley R. R., supra,* at 430.

While *Ex parte Peterson, supra,* and *Meeker & Co. v. Lehigh Valley R. R., supra,* concerned the federal constitution and a federal statute, respectively, we find their rationale persuasive. As contrasted to *Meeker, supra,* where the findings were admitted as "prima facie" evidence, under Chapter 655, the findings of the panel are accorded no particular weight, and we have held that the jury shall be so instructed. The provisions of Chapter 655, Stats., as we have construed them, do not abridge the rights of the petitioners to a trial by jury.

We therefore conclude that sec. 655.03(1), Stats., does not authorize the appointment of six-member panels, and as to those challenges advanced by the petitioners, we hold Chapter 655 to be a constitutionally valid enactment.

*By the Court.*—Rights declared and cause remanded for further proceedings consistent with this opinion.

ABRAHAMSON, J. *(dissenting in part)*. I consider this medical malpractice statute within the following context:

Courts should be favorably disposed to extrajudicial methods of settling disputes. The hardships imposed upon litigants by our already over-crowded court dockets need not be belabored. The legislature has broad scope to deal with economic problems and experiment with solutions to economic problems. "The criterion of constitutionality is not whether we [the judges] believe the law to be for the public good." *Adkins v. Children's Hospital,* 261 U.S. 525, 567, 570 (1923) (Holmes, J. dissenting opinion). Our task is to determine whether the statute clearly contravenes a constitutional provision. All legislative acts are presumed constitutional, and any doubts that exist must be resolved in favor of the constitutionality of a statute. *Buse v. Smith,* 74 Wis.2d 550, 247 N.W.2d 141 (1976) and cases cited therein (dissenting opinion). This court is not the legislature, and it should not make legislative policy for the state.

I believe that the majority has exceeded the limits of judicial construction in seeking to uphold the constitutionality of sec. 655.19, Stats., which provides:

"No panel member may participate in the trial either as counsel or witness . . . .
"(1) The findings and order, except for damages awarded, of any formal panel shall be admissible in any circuit or county court, and the amount of damages awarded may, at the court's discretion, be admissible in such action . . . .
"(2) The findings and order of any informal panel shall not be admissible in any court action. No statement or expression of opinion made in the course of an informal panel hearing is admissible in evidence either as an admission or otherwise in any court action."

I.

In its effort to uphold the constitutionality of sec. 655.19, the majority opinion fails to come to grips with

▆▆▆▆▆▆▆▆▆▆▆▆

the threshold question: does the statute *as written* deprive the parties of a fair trial? The question raised by the parties is whether a jury can evaluate the panel's findings and order with objectivity or whether the impact of the panel's findings and recommendations—which are not subject to challenge by usual adversary procedures—is so overpowering that the trial is infected with prejudicial taint. The court never discusses the question. Instead, it proceeds with a presumed duty to read into the statute those elements which will make it constitutionally valid.

I submit that the majority has not merely followed the cases it cited which require this court to interpret a statute so that its application is valid or which allow the court to impose upon the statutory scheme a well-accepted procedure to assure due process or equal protection of the laws. I believe the majority has written a new statute and has written it as if all the modifications were constitutionally mandated.

The majority opinion says that "few statutes can be written to completely cover all areas of concern." True. Nevertheless, in an attempt to fill in the gaps, the majority without hesitation borrows provisions from the "medical panel statutes" of other states and adds them to our statute. These are policy choices which should be made by legislators, not by several members of this court.

This court has improperly made legislative policy decisions in constitutional terms without telling the legislature specifically where it went wrong in the statute it wrote. If the statute is defective and needs revision, the court should explain where and why and allow the legislature to make the revisions. Indeed the Wisconsin legislature itself is well aware of the need to revise chapter 655. State Representative Joseph C. Czerwinski, Chairman, Health Committee, Wisconsin Assembly, a legislator intimately involved with Wisconsin's attempt to cope with the medical malpractice crisis, wrote:

"... The Assembly felt that availability of insurance was the issue and that the state should take steps to make insurance directly available if physicians were unable to obtain it. The Senate believed that not only should the state make insurance available if insurance was unavailable privately, but also should undertake fundamental revisions of the tort liability system to insure that the voluntary market would continue to provide medical malpractice insurance.

"Neither House receded from its position, with the result that Assembly Bill 725 bounced back and forth between the two houses. . . .

"... I would note that in order to satisfy the strongly divergent views of the two Houses, an extremely complex bill had to be prepared and acted upon in a short time. We have already had two trailer bills to correct inequities created by this hasty enactment. I suspect we will be amending and correcting the bill for many years." *(Wisconsin's Medical Malpractice Crisis,* in A Legislator's Guide to the Medical Malpractice Issue, The National Conference of State Legislatures (1976), p. 55.)

If the submission of the panel's findings to the trier of fact without a direct challenge being permitted is invalid, the legislature has two basic policy choices: (1) it can eliminate the submission of the findings; or (2) it can provide sufficient safeguards to assure that the probative value of the panel's findings as evidence will outweigh their prejudicial effects. If the legislature were to decide to implement the second choice, it might not choose the same "safeguards" the majority opinion does. Indeed it is unclear if the majority is saying that all or merely some of the "safeguards" it sets forth are constitutionally required. Must the trial court always submit the dissenting report of the panel? Must the trial court always allow the parties to comment on the panel's report in argument? Must the trial court always allow the parties to present witnesses to impeach the panel's findings? (What about allowing witnesses in support of or in explanation of the panel's findings?) Must the

panel's findings always include findings as to ultimate facts and findings of primary or evidentiary facts but not conclusions of law? (This part of the majority's opinion is especially troublesome. Lawyers and courts have great difficulty in distinguishing between findings of ultimate facts, primary facts, evidentiary facts and conclusions of law. How can we expect the panel to make this distinction? What will be done if the panel's findings do not fit the majority opinion's description?) Must the trial court give a cautionary instruction to the jury in each case?

If all of these safeguards are constitutionally required, the likely result is that the focal point of malpractice trials will be the question of whether the panel erred rather than whether the medical care provider erred. I do not believe this is the end result for which the majority or legislature aimed.

## II.

Sec. 655.19 (1) provides that the submission at trial of the award of the panel—the dollar figure—is within the discretion of the trial court. Nothing in ch. 655 gives the trial court the basis upon which to exercise this discretion. I assume this court can review the trial court's exercise of discretion for abuse of discretion. We have repeatedly held that the exercise of discretion must depend on facts that are of record or that are reasonably derived by inference from the record and the basis of that exercise of discretion should be set forth. This court will not find an abuse of discretion if the record shows that discretion was in fact exercised and if the record shows that there is reasonable basis for the trial court's determination.

The only logical basis upon which the trial court can exercise its discretion is that it finds the panel acted on

the basis of good and sufficient evidence and that the award represents a reasonable figure. Although this court has permitted the trial court the power of remittitur after a jury verdict, we do not permit the trial court to advise the jury as to its view of the reasonable range for awarding damages. Perhaps we should. If so, the issue is squarely presented by sec. 655.19, Stats., and should be decided. The majority fails to do so.

### III.

A central element of justice is impartial decision-making. A decision maker who has an interest in the outcome of the litigation cannot fairly adjudicate the case. It is not possible to define with precision the degree or type of pecuniary interest which will disqualify a decision maker. The test set forth in *Tumey v. Ohio,* 273 U.S. 510, 532 (1927) is whether the personal interest is one which:

". . . would offer a possible temptation to the average man as a judge to forget the burden of proof required . . . or which might lead him not to hold the balance nice, clear and true between the [parties] . . . ."

The financial interest need not be direct; an indirect financial benefit may also be prejudicial. *Ward v. Village of Monroeville,* 409 U.S. 57 (1972); *Gibson v. Berryhill,* 411 U.S. 564, 579 (1973). I do not read *Gibson* as disqualifying members of a profession from passing on the qualifications of applicants for admission to the profession or from reviewing and passing judgment on the conduct of a professional. Thus the presence of health care providers on the panel is not objectionable *per se.* The majority's attempt to characterize petitioners' argument as assuming that all health care providers are prejudiced is unfair and inaccurate.

*Gibson* involves members of the profession who had more than a remote, speculative financial interest caused by decreasing or increasing potential competition in the profession. The United States Supreme Court relied on the trial court's view of the facts of the case to conclude that the panel members had a financial interest which made them biased. Under these circumstances, no showing need be made that the particular panel member is less than totally fair. Rather the United States Supreme Court found that the mere possibility of unfairness was sufficient. For a discussion of bias, *see* McCormack, *The Purpose of Due Process: Fair Hearing or Vehicle for Judicial Review*, 52 Tex. L. Rev. 1257 (1974) ; 2 Davis, Administrative Law ch. 12 (1958).

The issue in the instant case is whether the annual assessment against the medical members is the extra element which makes the panel suspect. The dimensions of the financial interest were not set forth in the stipulation or briefs. The majority is thus determining, without any factual support, that "any financial interest inherent in the structure of Chapter 655, Stats., is too remote and speculative to require disqualification." I do not believe this court, on this record, can reach any conclusion as to the bias of the medical members.

I believe that the majority opinion should be read to allow the "financial bias" of the medical members, if any can be shown, to be commented on by the parties in opening and closing arguments, by presentation of witnesses and in the cautionary instruction.

IV.

Obviously the majority believes that sec. 655.19, Stats., as written by the legislature, permitting the submission of the panel's findings and order, deprives the parties of a fair trial. If that is the holding of this court, I would

strike the offending parts of sec. 655.19, Stats., relating to the submission. If there is to be a valid procedure for submitting the panel's findings and order as evidence, I believe its creation is for the legislature, not this court.

I am authorized to state that Mr. Justice Heffernan joins in this opinion.

DAY, J. *(dissenting)*. I dissent from that part of the majority opinion that holds that sec. 655.19(1), Stats. does not offend the right to a jury trial guaranteed by the Wisconsin Constitution. 665.19(1), Stats. provides:

"The findings and order, except for damages awarded, of any formal panel shall be admissible in any action in circuit or county court, and the amount of damages awarded may, at the court's discretion, be admissible in such action . . ."

The majority opinion states (p. 18):

"Without the special expertise of medically-trained panel members, the central purposes of the entire statutory scheme would be frustrated."

The majority then says (p. 27):

"We believe the statutory admissibility of panel findings and orders is, in essence, a rule of evidence. . . . Similar statutory provisions in other states have been characterized as evidentiary rules allowing a specialized form of expert opinion. . . . Thus viewed, the admissibility of the panel's findings is constitutionally unobjectionable because litigants have no vested rights in particular rules of evidence."

It is more than a mere rule of evidence when the opinions of an "expert" are not subject to cross-examination. The very essence of a trial is the right to examine and cross-examine witnesses. The designation of panel findings as a "specialized form of expert opinion" is dif-

ficult to rationalize. The formal panel is made up of a physician and if a physician is the respondent, then another physician, or if a health care provider other than a physician is one of the respondents then a member of that particular occupation is to be designated a member. The three remaining members of the five person panel are an attorney appointed by the administrator and two public members who are not attorneys appointed by the governor for two year terms. We fail to see where the expertise lies here. If the theory is that the physician and the other health care provider are "experts" the other three members; the attorney and the two lay-people, are no more "experts" than any member of a jury. The three lay people may outvote the two members in the health care field and yet under the majority opinion, their opinion on negligence, causation and in the court's discretion damages, are then given to the jury as "expert opinion" with no opportunity for cross-examination by either party. This in my opinion clearly invades the province of the jury and is impermissible under our Wisconsin Constitution.

I am also of the opinion that sec. 655.015, Stats. providing that an award for future medical expenses in excess of $25,000 is to be paid to the future medical expense fund and to be disbursed in periodic payments for those expenses until the amount is exhausted or the claimant dies, is unconstitutional. The majority opinion says (p. 13), "This procedure was obviously intended for the benefit of the claimant with substantial injuries requiring long term treatment . . ."

I see no "benefit" to the claimant. If the award for future medical payments was made to him, he could invest it and be accumulating interest to help meet medical payments as they arise. There is no provision for interest payments for the amounts withheld under the statute.

The Wisconsin Administrative Code, Insurance 3.37 (4) (h), established by the commissioner pursuant to 655.015, Stats. provides in part:

". . . should the injured person become deceased and there is a balance in his account allocation, that amount shall be returned to the insurer, organization or person responsible for establishing the account."

The only one to benefit under this arrangement is the insurer. If the claimant dies this becomes a windfall benefit to the insurer. There is no balancing provision, such as providing that necessary medical expense payments will continue for the life of the claimant if the amount awarded is exhausted. The risk is all on the part of the claimant. It lacks fundamental fairness and violates the equal protection provisions of the United States and Wisconsin Constitutions. I would hold that any award for future medical expense must be paid to the claimant as other elements of an award for damage are paid under the act.

I am authorized to state that Justice HEFFERNAN joins in this dissent and that Justice ABRAHAMSON joins in that part of this dissent concerning sec. 655.015, Stats.